## Oregonia Bridge Company v. Floyd County.

(Decided October 15, 1918.)

### Appeal from Floyd Circuit Court.

1. **Contracts—Evidence—Specifications.**—If in contracts for the construction of a building or other structure according to plans and specifications it should turn out after the contract was entered into that there were neither plans nor specifications concerning a particular part of the work contracted to be done, it is competent for the parties to supply the omission by mutual agreement, and if done, and the work is constructed accordingly, and in the manner provided by the contract, the contractor will not be liable because of subsequent unforeseen developments whereby the supplied plans and specifications proved insufficient, especially so if such developments were the result of negligent and wrongful acts of a third party.

2. **Bridges—Negligence in Construction of Bridge.**—A county contracted for the construction of a steel bridge, the work to be done according to plans and specifications and in good, workmanlike manner. There were neither plans nor specifications concerning the depth of the piers, but this was afterward agreed to by the officers of the county and ratified by the fiscal court, and the work completed according to contract and accepted as such by the county. Because of wrongful acts of a logging company the stream was dammed and the channel diverted against one of the piers, producing such a current as to undermine it although erected on a foundation which both the contractor and the agents of the county deemed sufficient, and which would not have occurred had it not been for the negligence of the logging company. Held, that the contractor can not be held liable for damages produced by the undermining of the pier.

MAY & MAY and BRANDON & IVANS for appellant.

C. P. STEPHENS and J. C. HOPKINS for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The fiscal court of Floyd county, in June, 1913, entered into a contract with appellant and defendant below, Oregonia Bridge Company, to construct a steel

Bridge across Beaver creek, near its mouth, in that county. The bridge was to be 180 feet long and 16 feet wide, to be hung by steel superstructure and supported upon piers at either end, each of them to consist of two iron tubes forty inches in diameter and set in concrete. The obligatory clause of the contract on behalf of defendant was "that the party of the first part doth hereby agree to furnish all material and construct and complete in good and workmanlike manner, and in accordance with the specifications hereunto attached, which are made a part of this contract, the steel superstructure and substructure as per plans submitted, accepted and filed in county judge's office, and complete the same on or before the 30th day of October, A. D. 1913."

The contract was executed on the 17th day of June, and shortly thereafter defendant began the construction of the bridge at the location designated by the fiscal court and completed it within the time agreed upon, whereupon the fiscal court in a body inspected the work and agreed to and did accept it as having been completed according to contract, and by an order duly entered directed the issual of warrants in payment therefor. The order of the fiscal court as entered upon its order books accepting the bridge and directing the contract price to be paid to defendant was made on November 17, 1913, and after reciting the members of the court who were present (being all of them), it says:

"It appearing that the Oregonia Bridge Company has completed the steel bridge across the creek of Beaver, near its mouth, according to the contract, and the fiscal court having in a body gone and inspected the said bridge and accepted the same as having been completed according to the specifications and according to contract made by said bridge company and Floyd county," &c.

This is followed by the directions for payment to be made in accordance with the contract price, which was $5,900.00, plus $340.00 for some extra work that had been agreed upon.

Some time in the year 1916 the pier at or near the left end of the bridge, going up the creek, began to careen, and it was discovered that its concrete base in which the iron tubes were set had become slightly undermined, resulting in the county removing the pier and constructing another in its stead at an expense of about $3,000.00.

This suit was filed by the county against the bridge company to recover from it damages upon the ground that it had not constructed the bridge in accordance with the plans and specifications "in good and workmanlike manner," as it had agreed to do in its contract.

The answer put in issue the allegations of the petition, except it admitted that the pier had careened, but it alleged that this was produced not because of any defective construction, or any violation of any terms of its contract, but because the county had suffered and permitted others to fill up the channel of the creek for quite a distance above the bridge, as well as under and below it, with saw logs to such an extent that it diverted the channel from its natural course over and around the pier, causing the water to flow with such force as to undermine the foundation of the pier, and but for which it would have remained firm and as contemplated by the terms of the contract, which defendant had fully performed. It was further averred in the answer that the county, through its fiscal court, accepted the work as having been completed according to contract, after its designated agent had supervised and observed its construction while the work was being done, and after having inspected the bridge before accepting it. Appropriate pleadings made up the issues, and upon trial before a jury a verdict was returned in favor of the county against the defendant for the sum of $1,200.00, upon which judgment was rendered, and defendant's motion for a new trial having been overruled, it posecutes this appeal.

A number of errors are relied upon, but under the view which we have taken of the record we do not deem it necessary to consider but one of them, which is the order of the court overruling defendant's motion for a peremptory instruction. The only defect complained of in the pleadings, evidence, or by counsel, is that the concrete base of the pier in question was not placed upon a sufficient foundation. There is not only no complaint concerning the quality of the work which was done, both superstructural and substructural, but it is admitted by every one that all of it which was actually done was of the very best quality.

At the time the site for the bridge was selected and the work was about to be commenced a logging firm operated a boom just below the selected site, and it had

quite a number of logs in the creek for a considerable distance above that point. The agent of the defendant, who had charge of the construction of the bridge, called the attention of the members of the court to the necessity of having the logs as well as the boom removed and taken from the creek in order to preserve the bridge, and some conferences were had with the owners of the boom looking to the removal of this menace to the bridge. However, that was not done, but on the contrary an increased number of logs were permitted to accumulate after the completion and acceptance of the bridge, which, according to the undisputed testimony, caused the flow of the stream to be diverted from the regular channel about the middle of the creek to the side where the pier was located, and during heavy and extraordinary rises this caused the foundation of the pier to be undermined, as heretofore described. No witness in the case, not even the county judge, nor any member of the court, disputes the fact that if it had not been for the accumulation of the logs the foundation of the pier would have been sufficient and it would have been standing today. Indeed the testimony shows that the defendant, of its own accord, did considerable more concrete work than it had agreed to do in order to protect, if possible, the bridge from danger because of the accumulated logs.

On September 21st, 1915, before this suit was filed on April 8th, 1916, the county brought suit against the owners of the logging boom to recover damages to the pier in question, which it charged were due to the negligent and unlawful acts of the defendant in that case, by collecting the logs in the stream "and thereby diverting the water from its regular channel and running the same with great and unusual force against the bank of the creek on the left hand side thereof, and between the concrete pier of the bridge and channeling out of the bed of the stream close to said pier, and thus endangering the security of the pier and of the bridge." It was further alleged that defendants therein had already caused a channel "of more than ten feet to be dug out near said pier, which it will be necessary for the plaintiff, at great expenditure of time and money, to repair," &c. It was then charged that if that process continues "the bridge will be undermined and caused to fall and destroy the pier and the bridge built upon the same."

As heretofore stated, the testimony given by the county judge and the members of the court in this case sustain the allegations made in the suit against the owners of the boom, which suit has not yet been tried, although filed, as seen, more than six months before this one. There is evidence in the case that the pier probably would have stood had it been built upon solid rock, or properly driven piles, but the testimony does not make this altogether certain. At any rate there seems to have been no specifications made or furnished as to the foundation of the pier before the contract was entered into, or at any other time. Blue print plans were furnished, and it was by these that the bridge was constructed, but there is nothing on these plans to indicate the depth of the excavation for the concrete foundation. This being true, it was competent for the parties to the contract to subsequently agree concerning this point, which was done by the officers of the county and subsequently ratified of record by the order of acceptance.

The agent for the defendant, Mr. Reece, who had charge of the construction of the work, says that he excavated below the surface of the bottom of the creek to the depth of ten feet, where he struck a slaty, blue sandstone substance, so hard that he could not stick his pick into it. Some members of the fiscal court, including the county judge, were present at the time, and they substantiate the testimony of the defendant's agent on this subject. The county engineer, who was a member of the court, testifying upon this point, said: "I was there about the time he got his excavation made, and Mr. Reece (defendant's agent) represented that the foundation was solid, and so I thought the same, and whoever it was with us thought it was very solid. Q. Tell the jury what it looked like, 'Squire. A. Well, it looked like—blue nature hardly the color was, between slate and clay, is my recollection, mixed some with rock. Seemed to be of a dry, hard nature." Upon being asked on whose judgment he acted in accepting the bridge he said: "I relied upon some of my own judgment. As to the foundation there I thought it was sufficient, and Mr. Reece, I think he expressed, he thought it was sufficient, and I thought at the time it was sufficient and yet think so if it had not been for that pressure of logs."

The county judge, testifying upon this point, was asked and answered the following questions: "Q. De-

scribe to the jury just the character of the subsoil where this concrete was put in as near as you can. A. Well, it seemed to me to be hardly slaty—that is, a soft slaty nature or substance on the botton of that work, and he even jobbed his pick in there and said he couldn't chop it; and didn't. Q. Was it your judgment at that time, Judge, that that was sufficient and substantial, solid foundation for the pier? A. Yes, he made me believe it was all right, and I believe the bridge would have been standing yet if it hadn't been for that water. Q. Did Mr. Reece, the man who represented the bridge company, in the construction of the bridge, appear to have taken a thorough test of it at the time you and him discussed it there? A. Well, he seemed much interested, and that he didn't want to put the bridge there; was as anxious as I was to have it done right.''

It will therefore be seen that those representing the county had the opportunity to and did judge for themselves the character of support upon which the concrete foundation was built, and that they concluded it was sufficient and consented to and acquiesced in the construction of the concrete upon that foundation. As we have seen, in the absence of specifications concerning this part of the work it was competent for the parties to agree about it. This undoubtedly was done, and there is no complaint but that the bridge was constructed accordingly. The bridge company did not agree, under its obligation, to construct the bridge ''in a workmanlike manner'' to guarantee against negligent or wrongful acts of third parties, and since the undisputed proof shows that the damage to the pier was produced solely from such causes and that the bridge was constructed in the manner agreed upon in the contract as modified by the subsequent agreement concerning the foundation of the pier, it is difficult for us to see wherein the damages can be charged to any dereliction of the defendant. All the testimony is to the effect that the foundation of the pier was abundantly sufficient had it not been for the illegal and wrongful acts of the logging company in diverting the stream. All the work which defendant did was done ''in good, workmanlike manner,'' and in a manner to which the county consented, and no principle of law or justice known to us would require the company to respond in damages produced by no fault on its part, but exclusively because of wrongful acts of third parties which the county could and it was

its duty to have prevented. There is not a scintilla of proof in the case but that the work was constructed according to contract, except the fact that the pier careened after some two or three years, which is shown to have been produced entirely in the manner heretofore mentioned. All this taken in connection with the testimony we have discussed, and the acceptance by the fiscal court of the work when completed, convinces us that the fiscal court was satisfied with the foundation of the pier and believed as strongly as did defendant's agent that it was sufficient for all ordinary purposes; and further, that they were correct in this and that the bridge would have been standing today but for the wrongful acts of the logging company. Indeed, the evidence shows that since the logs were removed, which had been done at the time of the trial, the channel was filled around the pier and resumed its normal position near the center of the stream. We therefore conclude that the defendant, under the facts disclosed by the record, is not liable, and that its motion for a directed verdict should have been sustained.

Wherefore, the judgment is reversed for proceedings in accordance with this opinion.